### 29127. MOTOR CONTRACT COMPANY *v.* CITIZENS AND SOUTHERN NATIONAL BANK.

*Hester & Clark,* for plaintiff in error.
*Hinton Booth, Lee, Congdon & Fulcher,* contra.

Sutton, J.   The Citizens and Southern National Bank filed three petitions for foreclosure of three bills of sale to secure debt on three described automobiles.   After levy thereupon by the sheriff, the Motor Contract Company filed three claims to the respective automobiles, alleging title in itself.   Upon the trial of the issues the three claim cases were consolidated as one case, and the court, presiding without the aid of a jury, rendered judgment for the claimant.   A new trial was granted, and on the second hearing judgment was rendered for the plaintiff in foreclosure.   The exception here is to the judgment overruling the claimant's motion for new trial.

The following case is made by the record, as stated in the briefs of counsel, and agreed to by them:   The Motor Contract Company is engaged in the automobile financing business, but is not engaged in selling automobiles.   From time to time it financed automobiles for J. H. Grumbine, who was an automobile dealer in Guyton, Georgia, operating as Guyton Motor Company.   The automobiles here involved were ordered from the manufacturer by Grumbine for purposes of resale, and this fact was known to Motor Contract Company.   It is customary in the automobile business for cars to be financed for dealers by finance companies.   The method of financing used in this case is in general use.   The Motor Contract Company is notified by the manufacturer that cars ordered by the dealer are ready for shipment, and the Motor Contract Company instructs its bank to make payment for the cars out of its funds in bank.   Upon payment to the manufacturer the cars are delivered to a transportation line, which transports them directly from the plant of the manufacturer to the dealer.   The cars do not come into the possession of the Motor Contract Company.   Before the

money is transferred to the manufacturer the dealer executes "trust receipts" in blank, merely describing the automobile by make, the motor number and serial number not being at that time known. After the cars reach the dealer's place of business, new papers are executed by the dealer and are substituted for the blank "trust receipts." These new papers specify the amounts paid and describe the cars specifically by make and number. The instruments are executed by the dealer to the finance company and are divided into three portions, one of which is designated as a "bill of sale," another a "trust receipt," and the third a "promissory note." The promissory note is separated from the rest of the writings by a perforated line. These papers are not recorded by the finance company unless the dealer becomes involved financially to the knowledge of the finance company or is threatened with bankruptcy.

Three cars are here involved. After the dealer had executed to the finance company such papers as are above mentioned and the three cars in question were in the possession of the dealer, the latter approached a representative of the Citizens and Southern National Bank in Statesboro, Georgia, and, without informing this representative, W. W. Woodcock, of any claim by Motor Contract Company to the cars, stated to him that the three automobiles were in his possession and that he desired to obtain loans thereon. Woodcock did not see the automobiles at the time, and did not examine the records in the office of the clerk of the superior court of the county of the dealer's residence to ascertain what these records might show, but, relying upon the representations of Grumbine that the automobiles were in his possession, belonged to him, and were free from liens, the Citizens and Southern National Bank lent to him various sums of money, taking as security therefor bills of sale to secure debt and also "trust receipts." Such bills of sale and promissory notes executed to the bank were in evidence, but not the "trust receipts." These bills of sale to secure debt were duly recorded, and thereafter the cars were checked by Woodcock. The bank had no notice, actual or constructive, of the rights of the finance company at the time its loans here involved were made. The papers executed by Grumbine to the finance company had not been recorded. The Motor Contract Company's papers, which were executed to it by Guyton Motor Company, were recorded subsequently to those which were executed in favor of the Citizens and

Southern National Bank. Woodcock, when he lent the money to Guyton Motor Company on behalf of the bank, did not ask for or see any bills of sale or other instruments in connection with the financing of the cars in Guyton's possession, though he testified: "I might have presumed that some one else had been previously financing him, because practically all dealers do finance their cars."

More specifically the papers executed by Guyton Motor Company to Motor Contract Company may be described as follows: A bill of sale in which was described the automobile conveyed "for valuable considerations" and also the amount due thereon by Guyton Motor Company. Following this writing and on the same sheet of paper was set out a "trust receipt," in which the dealer acknowledged receipt from Motor Contract Company of a described automobile and in which it was recited: "I (we) hereby acknowledge that said motor vehicles are the property of said Motor Contract Company and agree to take and hold the same, at my (our) sole risk as to all loss or injury, for the purpose of storing said property; and I (we) hereby agree to keep said motor vehicles brand new and not to operate them for demonstrating or otherwise, except as may be necessary to drive said motor vehicles from freight depot or from receiving city to my (our) place of business with all due care at my (our) risk en route against all loss and damage to said motor vehicles, persons or property, and except as I (we) may be allowed by you in a special case to use the same for demonstrating upon our compliance with the conditions expressed in your instructions to us, and to return said motor vehicles to said Motor Contract Company or its order upon demand at any time and for any reason; and pay and discharge all taxes, encumbrances and claims relative thereto. I (we) hereby agree not to sell, loan, deliver, pledge, mortgage, or otherwise dispose of said motor vehicles to any other person until after payments of amounts shown on dealers' record of purchase and release of like identification number herewith. I (we) further agree that the deposit made by me (us), in connection with this transaction, may be applied for reimbursement for any expense and/or loss incurred by Motor Contract Company, in the event of breach of this trust or repossession of said motor vehicle. It is further agreed that no one has authority to vary the terms of this trust receipt." Following this "trust receipt" was a promissory note, separated from the other writings by a perforated

line, signed by Guyton Motor Company for the principal amount shown in the bill of sale. All three writings bore the same date of execution.

It appears from copies of claimant's exhibits in the record that as to two of the cars in question the claimant caused its bank in Savannah to wire the purchase price to a bank in Detroit, Michigan, the point of shipment, for payment to the manufacturer "for account of Guyton Motor Company," with instructions to release the car to a transportation line for delivery to Guyton Motor Company at Guyton, Georgia. As to the third car, a truck, the Savannah bank wired the Detroit bank to pay the manufacturer the purchase price of the truck for account of "Jackson Motor Company," with instructions to release the truck to a transportation line for delivery to Guyton Motor Company at Guyton, Georgia.

The issue here presented is whether or not under the papers executed to the finance company by the dealer it held a title superior to that of the bank under the bills of sale which it held as security for the loans made by it to the dealer on the cars in question. To determine this question it is necessary to decide whether or not the "trust receipts" executed by the dealer to the finance company are such instruments as come within the provisions of the Code, § 67-2501, which provides: "Deeds, mortgages, and liens of all kinds, which are required by law to be recorded in the office of the clerk of the superior court, shall, as against the interests of third parties acting in good faith and without notice, who may have acquired a transfer or lien binding the same property, take effect only from the time they are filed for record in the clerk's office." There is no provision in this State for the recordation of a true trust receipt, and if under the facts of this case the finance company held the full legal title to the automobiles, and the "trust receipt" here involved was such an instrument as evidenced and recognized such title to be in the finance company, and that the dealer had mere permissive possession of the cars with the right to become, for the first time, the legal holder of the title thereto by paying to the finance company a sum of money as a consideration for such property, it must naturally follow that the bank would not be protected as an innocent purchaser under the bills of sale executed to it by the dealer, notwithstanding the fact that the papers held by the finance company were recorded subsequently to

those of the bank. If, however, the dealer held title to the cars which, after receipt of funds from the finance company, were shipped to it by the manufacturer, and the papers executed by the dealer to the finance company, properly construed, evidenced only a chattel mortgage or lien upon the property, as contended by the defendant in error, and as ruled by the trial court, the asserted title of the bank, by reason of its recordation of its bills of sale to secure debt before the papers of the finance company were placed on record, must prevail.

As stated by a writer in 19 California Law Review, 261, in a discussion of "trust receipts" used in the financing of purchases, "As a preliminary matter it should be noted that the trust receipt is not evidence of a trust. In a trust one party called a trustee has title, i. e., ownership, and generally also possession. He holds these interests for the advantage of a beneficiary called a cestui que trust. The reference to trusts, in a trust-receipt transaction, is not only a misnomer, if the theory of the sponsors of trust receipts is to be accepted, but it invites attention to the very matter which it is of most concern to these sponsors to avoid; namely, the possibility that the one who executes the trust receipts may be regarded as the true owner. The theory is, of course, precisely the contrary. The one who executes the trust receipt does not assume to be the owner. The owner is the creditor who accepts the receipt." This discussion, of course, has reference to a situation where the finance company has derived title by its purchase from the shipper of goods which are to be delivered to a merchant. Where it may be said that title never went into a finance company, but to the merchant at the outset, the giving of a "trust receipt" by the latter presents a greater anomaly. The present use of a "trust receipt" in the financing of automobiles is an extension of the earlier practice of financing imports. In the latter case an importer being without sufficient cash for the purchase of desired goods abroad arranged for a shipment to be made to a given bank. This bank took up the draft and bill of lading and became the actual owner of the goods, which subsequently it caused to be delivered to the merchant upon the execution by him of certain trust receipts to the bank. The courts, recognizing this' method as a very convenient and efficient aid to commerce, consistently sustained the validity of such trust receipts. With the coming of the automobile and the

growth of finance companies engaged in providing funds for the payment of cars to be shipped to a dealer by the manufacturer resort has been had to the same device of trust receipts in such financial transactions. In many of the earlier cases where the finance company obtained its asserted title from one other than the dealer the courts have generally upheld such trust receipts as unaffected by any general recordation acts unless specifically made so by statute. But where the cars were shipped as the property of the dealer, though paid for by a finance company at the time, and subsequently the dealer executed to such finance company a so-called "trust receipt," and even in some cases where the title was admittedly originally in the finance company as derived from a source other than the dealer, an investigation of the authorities and annotations reveals that the weight of more recent decisions has been to look beyond the mere language of the instrument, and to consider the relations of the parties under the facts and circumstances and regard the so called "trust receipt" as nothing more than the creation of a lien, although much disagreement has arisen as to the exact nature of the instrument, some of the courts treating it as a chattel mortgage, some as a conditional sale, some as a bailment or pledge, and some as a nondescript device unlike such usual instruments but, under the facts and circumstances, evidencing nothing more than a lien on goods in the hands of the real owner.

In McLeod Nash Motors *v.* Commercial Credit Trust, 187 Minn. 452 (246 S. W. 17, 87 A. L. R. 296, an excellent annotation on "trust receipts" appearing in A. L. R.), it was ruled: "The court correctly ruled that the transaction evidenced by a trust receipt executed by plaintiff to defendant, and the acceptance of plaintiff of a time draft to defendant's order, was a chattel mortgage upon the automobiles named in the trust receipt. The recital in the trust receipt does not estop plaintiff from proving it was given as security; hence a chattel mortgage." That case was one in which the dealer sued the finance company for conversion of automobiles which it removed from the dealer's premises without its consent. In the opinion it was said: "It appears that trust receipts have been in use for a long time to finance imports. In such cases the banker who paid the draft obtained the bill of lading and title to the goods and delivered possession to the dealer upon his signing

the trust receipt, and he, from sales, was to pay the banker the amount of the draft the latter paid. This as between the parties is considered a true trust receipt; the dealer, the one giving the trust receipt, having at no time obtained title; hence he has no title or interest to mortgage or transfer. The clearest and most satisfactory judicial statement of the history, application, and limitation of the trust receipt doctrine is by Judge Augustus N. Hand in Re A. E. Fountain, Inc. (C. C. A.), 282 Fed. 816, 828. The conclusion after reviewing cases was that: 'The only cases where the holders of trust receipts have been allowed by this court to prevail against the ultimate purchaser or his trustee in bankruptcy have been those where the title of the holder of the trust receipt was derived from some one other than the debtor.' The conclusion, upon facts stronger in favor of the holders of the trust receipts than in the instant case, was that the two transactions evidenced by the receipts were chattel mortgages. In Motor Bankers' Corporation v. C. I. T. Corporation, 258 Mich. 301, 241 N. W. 911, notwithstanding that the dealer gave a bill of sale and trust receipt and an accepted time draft to the defendant as part of the same transaction, the court held it a chattel mortgage. There is no good reason why the law pertaining to true trust receipts should be extended to loans secured by property, the title and possession of which has been and remains in the borrower except for the rights given the holder of a trust receipt. Filing and recording acts are for the purpose of disclosing to third parties who intend to become interested in personal property that those in possession thereof as ostensible owners are not such in fact. In respect to this attempted extension of the trust-receipt doctrine, the court in Re Cullen (D. C.), 282 Fed. 902, said: 'The question . . is how far a serviceable nag may be ridden, or, less metaphorically, may the so-called "trust receipt," highly useful in certain kinds of commercial transactions, and which the courts have in consequence struggled to sustain, in spite of its apparent conflict with recording laws, be upheld when the principal if not the sole reason for resorting to it is to escape from those very statutes.' And the court approved this test stated by the author of an article on 'Trust Receipts' in the Columbia Law Review for May and June, 1922: 'The only situation in which trust receipts can be properly used is one in which the title of property by way of security is conveyed

to the creditor by the owner, who is not the person responsible for the satisfaction of the obligation which the property secures.' Here the party who gave the trust receipt was responsible for the accepted time draft."

The facts of the present case clearly establish that the "trust receipt" here involved is entirely lacking in the essentials of a real trust receipt. The claimant was a finance company admittedly not interested in the purchase and sale of automobiles. It was engaged in the business of furnishing financial assistance to dealers in automobiles. The Guyton Motor Company did buy and sell automobiles. The claimant knew this and had been rendering it financial assistance. The claimant did not place any orders with manufacturers of automobiles. The order for the cars here involved was placed with the manufacturer by the dealer. While no part of the purchase price was paid by the dealer, the total amount being furnished by the claimant, the exhibits introduced in evidence by the latter, and by which it is bound, show that its name was not mentioned when its bank in Savannah wired the manufacturer's bank in Detroit the purchase price of the cars. On the contrary, the wire and confirmation by letter of the claimant's bank stated, in respect to two of the cars, that they were to be released for the account of Guyton Motor Company for shipment to it at Guyton, Georgia. As respects the third car the bank's instructions, in remitting by wire the purchase price, were that the money transferred was for the account of "Jackson Motor Company," but specified that the shipment was to be made to Guyton Motor Company. It is not made to appear how the Jackson Motor Company was interested in the transaction, but it is clear that the claimant was not doing otherwise than advancing money on behalf of another, rather than itself becoming the owner of cars which were to be put in transportation for Guyton Motor Company at Guyton, Georgia. The only reasonable construction of these transactions is that Guyton Motor Company then and there became the real owner of the automobiles. It is made to appear that Guyton Motor Company signed some sort of "trust receipt," in which only the make of the cars was mentioned, but as this paper was subsequently replaced by the instruments here under consideration, in which the automobiles were described by motor numbers and make, which, in connection with the other instruments executed by the dealer, form

the basis upon which the respective contentions of the parties are based, we forbear as unimportant any further discussion of these temporary papers.

In what legal status, then, do the papers executed by the dealer place the claimant? The dealer executed a promissory note for the amount advanced by the claimant, the finance company. To secure the same the dealer also executed what was termed on its face a bill of sale. It would be possible, in some cases, for such papers to so operate as to fully divest the title of the maker. But to hold that they do here would be to ignore the "trust receipt" executed in immediate connection with the bill of sale and on the same sheet of paper, and which as used, in the dealings between the finance company and the dealer, the defendant in error contends is merely the equivalent of a defeasance clause inserted in the bill of sale. If so, then the bill of sale and "trust receipt" must be taken as constituting only a chattel mortgage. As was ruled in *Ward* v. *Lord,* 100 *Ga.* 407 (28 S. E. 446) : "An instrument which purports to convey absolute title to personal property to secure a described promissory note, but which recites that the property is to be held in trust for the payment of that note, is executed and discharged by the fact of such payment, and the legal title in the grantee is then defeated. The creation of the trust for the purpose stated is the same in effect as the insertion of a defeasance clause in the instrument; and this being true, such instrument is a mortgage, and not a bill of sale which passes indefeasible title." See also *Scott* v. *Hughes,* 124 *Ga.* 1000, 1002 (53 S. E. 453), where it is said, "That the defeasance clause is not in the usual form or usual place does not make it any the less a defeasance clause," and *Lane* v. *Smart,* 21 *Ga. App.* 292 (94 S. E. 325) ; *Grady* v. *Harris,* 41 *Ga. App.* 111 (151 S. E. 829) ; *Daniels* v. *State,* 43 *Ga. App.* 779 (159 S. E. 903). It is a well-established rule of construction that the courts, in determining the true legal import of an instrument, will not be bound by any name by which it may be termed, but will look not only to the language of the instrument itself but to the facts and circumstances surrounding the parties thereto. While the "trust receipt" contains language which would indicate that the dealer held the automobile as the property of the finance company, the bill of sale and promissory note in connection with it render such a view untenable, and under the facts of the case show

that the parties were really dealing with the property as that of the dealer, but with an agreement on the part of the dealer as to its restricted use pending its sale. Otherwise, it would be a vain thing for the finance company to be accepting a bill of sale to property the title to which was not in the grantor but already in itself. Unquestionably the cars were held by the dealer for the purpose of sale, notwithstanding the provision of the "trust receipts" that they could not be sold or disposed of until after payment to and release by the finance company. While the "trust receipt" purported to give to the finance company certain control as to the automobile while in the dealer's possession, it is not, for reasons already stated, a true trust receipt, and it serves no other purpose, in connection with the other executed papers and the facts and circumstances of the case, than to show that the transaction amounted merely to the creation of a lien and chattel mortgage in favor of the claimant. *Ward* v. *Lord*, supra. No special form is necessary to create a mortgage. All the requisites are here present; the creation of a lien, a specification of the debt to secure which it is given and the property upon which it is to take effect. Code, § 67-102. The trial court properly held that the title of the plaintiff in foreclosure was, under the recording acts of this State, superior to that of the claimant.

All of the cases cited by the plaintiff in error have been examined but do not require any ruling different from that here made. They deal generally with situations where the finance company had acquired title from some one other than the dealer at the time of the execution by the latter of a trust receipt. In such cases the courts might reasonably hold the paper to be a true trust receipt and not as evidencing a mere lien. Many courts have, however, disregarded the vesting of title in the finance company as of any importance in testing the true relationship, and have, in matters involving automobile financing, regarded the process of issuing a "trust receipt" pending sale by the dealer as amounting to no more than the giving of security in the nature of a lien on property the real owner of which is the dealer. Our conclusion in the present case has been more readily reached because we think the facts show conclusively that the title to the automobiles was in the dealer from the outset. Lack of reference to any Georgia case is due to the fact that the issue here is one of first impression in this State.

*General Motors Cor.* v. *Dunn Motors Inc.,* 172 *Ga.* 400 (157 S. E. 627), cited and relied on by the plaintiff in error, is not in point. In that case no question of notice or of recording or of the interest of any third party was involved. The finance company had *itself* received from the manufacturer *a bill of sale* to certain automobiles, and the dealer was allowed to have possession under the terms of a true trust receipt. The dealer breached the trust. The finance company demanded possession of the automobiles. The dealer surrendered them to the finance company, which thereupon removed them and appropriated them to its own use. The dealer brought suit for "unlawful repossession and conversion of the property." The Supreme Court held that the dealer was bound by the terms of the trust receipt, and that the finance company was not guilty of the charges made, but acted within its rights under the binding contract. Whether or not if the claimant in the present case had received from the manufacturer a bill of sale for the cars shipped to the dealer, and the dealer had executed a trust receipt, a different situation would be presented it is not necessary to decide.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., concurs in the judgment.*

DECIDED OCTOBER 18, 1941.